**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE: TOWERS LITIGATION** | **MDL DOCKET NO. _____** |

**BRIEF IN SUPPORT OF DISH WIRELESS L.L.C.'S
<u>MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 3

LEGAL STANDARD ...................................................................................................... 7

ARGUMENT.................................................................................................................... 7

I.    The Requirements Of 28 U.S.C. § 1407 Are Satisfied ........................................ 7

    A.    The Towers Actions Involve Common Questions of Fact..................................... 8

    B.    Consolidation And Transfer Will Promote Efficiency And Convenience............ 11

    C.    Consolidation And Transfer Will Preserve Judicial Resources............................ 12

II.   The Towers Actions Should Be Centralized Before The Honorable Nina Y. Wang In The District Of Colorado, Or In The Alternative, The Honorable S. Kato Crews .................. 12

    A.    The Defendants Reside In The District of Colorado ........................................... 13

    B.    The Relevant Discovery Is Located In The District of Colorado ........................ 14

    C.    The First Two Towers Actions Were Filed In The District of Colorado.............. 15

    D.    The District of Colorado Has The Requisite Expertise And Capacity ................ 16

    E.    The District Of Colorado Is The Geographic Center Of The Towers Actions..... 17

    F.    The District Of Colorado Is Readily Accessible.................................................. 18

    G.    Several Related State Court Litigations Are Pending In The District Of Colorado ...................................................................................................................... 19

CONCLUSION ............................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1 Source Towers, LLC, et al., v. DISH Wireless L.L.C*, 2026CV030478 (Colo. Dist. Ct., 2d Jud. Dist. Feb. 6, 2026)...................................................................................................................7

*In re Acetaminophen - ASD/ADHD Prods. Liab. Litig.*, 637 F. Supp. 3d 1372 (J.P.M.L. 2022) ...........................................................................................................................................8

*In re Air Crash Near Peixoto De Azeveda, Brazil on Sept. 29, 2006*, 493 F. Supp. 2d 1374 (J.P.M.L. 2007) ..........................................................................................................16

*In re Archery Prods. Antitrust Litig.*, 2025 WL 2937322 (J.P.M.L. Oct. 16, 2025) .....................16

*In re Bausch & Lomb Inc. Contact Lens Solution Prods. Liab. Litig.*, 444 F. Supp. 2d 1336 (J.P.M.L. 2006) ............................................................................................................13

*In re BP P.L.C. Sec. Litig.*, 734 F. Supp. 2d 1376 (J.P.M.L. 2010)................................................14

*In re Century 21-Re/Max Real Estate Advertising Claim Litig.*, MDL 1008, 1994 WL 171221 (J.P.M.L. April 14, 1994)...............................................................................................13

*In re: CitiMortgage, Inc., Home Affordable Modification Program (HAMP) Cont. Litig.*, 816 F. Supp. 2d 1375 (J.P.M.L. 2011) ........................................................................................9

*In re Computervision Corp. Sec. Litig.*, 814 F. Supp. 85 (J.P.M.L. 1993) ...................................13

*In re CP Ships Ltd. Securities Litig.*, 360 F. Supp. 2d 1369 (J.P.M.L. 2005).........................13, 14

*In re Dividend Solar Fin., LLC, & Fifth Third Bank Sales & Lending Pracs. Litig.*, 753 F. Supp. 3d 1365 (J.P.M.L. 2024) .......................................................................................17

*In re Elec. Receptacle Prods. Liab. Litig.*, 313 F. Supp. 2d 1378 (J.P.M.L. April 8, 2004) .........11

*In re Elect. Data Sys. Corp. Sec. & "ERISA" Litig.*, 254 F. Supp. 2d 1375 (J.P.M.L. 2003) ...........................................................................................................................................12

*In re FMC Corp. Patent Litig.*, 422 F. Supp. 1163 (J.P.M.L. 1976) .............................................13

*In re Ford Motor Co. Crown Victoria Police Interceptor Prods. Liab. Litig.*, 229 F. Supp. 2d 1377 (J.P.M.L. 2002) .............................................................................................11

*In re Gen. Motors OnStar Contract Litig.*, 502 F. Supp. 2d 1357 (J.P.M.L. 2007) ......................13

*In re Glucagon-Like Peptide-1 Receptor Agonists Prods. Liability Litig.*, 717 F. Supp. 3d 1370 (J.P.M.L. 2024) ..........................................................................................................15

*In re Ins. Brokerage Antitrust Litig.*, 360 F. Supp. 2d 1371 (J.P.M.L. 2005)...................................8

*In re Internal Revenue Serv. 1031 Tax Deferred Exch. Litig.*, 528 F. Supp. 2d 1343 (U.S. Jud. Pan. Mult. Lit. 2007).......................................................................................................14

*In re JP Morgan Chase & Co.*, 452 F. Supp. 2d 1350 (J.P.M.L. 2006) .........................................16

*In re Kaba Simplex Locks Mktg. & Sales Practices Litig.*, 764 F. Supp. 2d 1339 (J.P.M.L. 2011) ......................................................................................................................................18

*In re Lithium Ion Batteries Antitrust Litig.*, 923 F. Supp. 2d 1370 (J.P.M.L. 2013) .....................13

*In re Living Social Mktg. & Sales Practices Litig.*, 807 F. Supp. 2d 1379 (J.P.M.L. 2011) .........15

*In re MLR, LLC, Patent Litig.*, 269 F. Supp. 2d 1380 (J.P.M.L. July 1, 2003) .............................11

*In re Municipal Derivatives Antitrust Litig.*, 560 F. Supp. 2d 1386 (J.P.M.L. 2008)....................13

*In re N.Y.C. Municipal Secs. Litig.*, 439 F. Supp. 267 (J.P.M.L. Nov. 1, 1977) ...........................14

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 269 F. Supp. 2d 1372 (J.P.M.L. 2003) ......................................................................................................................................18

*In re Nexium (Esomeprazole) Prods. Liab. Litig.*, 908 F. Supp. 2d 1362 (J.P.M.L. 2012)...........20

*In re: Packaged Antitrust Litig.*, 560 F. Supp. 2d 1359 (J.P.M.L. 2008) ......................................17

*In re Pharmatrak, Inc., Privacy Litig.*, No. 1400, 2001 WL 34834422 (J.P.M.L. Apr. 18, 2001)13

*In re Res. Exploration, Inc., Secs. Litig*, 483 F. Supp. 817 (J.P.M.L. 1980) .................................19

*In re Schering Mktg. And Sales Prac. Litig.*, 502 F. Supp. 2d 1353 (J.P.M.L. 2007) ...................12

*In re Serzone Prods. Liability Litig.*, 217 F. Supp. 2d 1372 (J.P.M.L. 2002)................................17

*In re Skelaxin (Metaxalone) Antitrust Litig.*, 856 F. Supp. 2d 1350 (J.P.M.L. 2012) ..................................................................................................................................12, 14, 15

*In re St. Jude Med., Inc. Silzone Heart Valves Prods. Liab. Litig.*, MDL 1396, 2001 WL 36292052 (J.P.M.L. Apr. 18, 2001)...................................................................................17

*In re Teflon Prods. Liab. Litig.*, 416 F. Supp. 2d 1364 (J.P.M.L. 2006) .......................................18

*In re TJX Companies, Inc.*, 505 F. Supp. 2d 1379 (J.P.M.L. 2007) ..............................................18

*In re UnumProvident Corp. Secs., Derivative, & "ERISA" Litig.*, 280 F. Supp. 2d 1377 (J.P.M.L. Sept. 2, 2003) .................................................................................................15, 20

*In re Wells Fargo Wage & Hour Emp't Prac. Litig. (No. III)*, 804 F. Supp. 2d 1382 (J.P.M.L. 2011) ...............................................................................................................................18

*In re Westinghouse Elec. Corp. Uranium Cont. Litig.*, 405 F. Supp. 316 (J.P.M.L. 1975).............8

**Statutes**

28 U.S.C. § 1407................................................................................................................ passim

Defendant DISH Wireless L.L.C. ("DISH Wireless") respectfully submits this memorandum of law in support of its motion to consolidate and transfer the related actions listed on the "Schedule of Actions" attached hereto (the "Towers Actions"), to the District of Colorado for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.

## INTRODUCTION

Beginning in 2019, DISH Wireless, along with certain of its affiliates, began working to deploy a nationwide, first-of-its-kind cloud-native Open Radio Access Network-based 5G network. That network relied on a portfolio of spectrum licenses and related assets that DISH Wireless's ultimate parent company, EchoStar Corporation, along with certain affiliates (which do not include DISH Wireless) ("EchoStar"), had acquired over a ten-plus year period, at a cost of over $30 billion, and to which EchoStar permitted DISH Wireless access. In order to facilitate the 5G network buildout and operation, DISH Wireless entered into numerous contracts with owners and operators of communications towers throughout the nation, as well as providers of network equipment or services (together, the "Towers Providers"), in order to secure access to the Towers Providers' tower and network infrastructure necessary to operationalize the spectrum for subscribers to its Boost Mobile brand.

By 2025, EchoStar had satisfied all applicable commitments to the Federal Communications Commission (the "FCC") relating to the relevant spectrum licenses. But in the summer of 2025, the FCC abruptly took unprecedented and unforeseeable action that ultimately required EchoStar to sell the relevant spectrum licenses, or have the licenses revoked. There has never been another instance where the FCC directed a similar license holder to either sell or forfeit its spectrum licenses nationwide. EchoStar held numerous meetings at the highest levels of the FCC and the government to avoid the involuntary loss of the spectrum licenses, but ultimately was

given no option to avoid license forfeiture other than to sell the relevant spectrum licenses to AT&T and SpaceX.

As a result of the required sales transactions (the "Required Sales Transactions"), DISH Wireless was no longer able to build, operate, or pay for the wireless network into which it had invested billions of dollars. The purpose of DISH Wireless's contracts with the Towers Providers was completely frustrated, and DISH Wireless's performance under the contracts themselves was rendered commercially impractical, indeed impossible. The FCC's actions, and the resulting Required Sales Transactions, also constituted a force majeure.

Against that backdrop, over the past three and a half months, DISH Wireless has been sued by Towers Providers in over a dozen related federal and state lawsuits (the "Towers Actions"), each based on substantially similar allegations and claims, namely that DISH Wireless has allegedly breached or defaulted on its obligations under various lease and service agreements by failing to make certain payments allegedly owed under those contracts, notwithstanding the fact that DISH Wireless no longer has access to the spectrum licenses that were being carried on the towers. Most of the actions seek a declaratory judgment that the Required Sales Transactions do not constitute a force majeure or otherwise excuse DISH Wireless's performance. Eight of those cases are currently pending in six different federal courts, and it is these eight federal actions that DISH Wireless now seeks to consolidate and transfer, along with any other subsequently filed federal cases.[1]

As set forth more fully below, transfer and centralization of the Towers Actions is appropriate and necessary to avoid duplicative proceedings, a waste of judicial resources, and the

---

[1] *See* Exhibit A, Schedule of Actions. Indeed, DISH Wireless is aware that another related complaint has been filed but not yet served, as recently as one business day ago. *See Comcast Business Communications, LLC, v. DISH Wireless L.L.C.*, 1:26-cv-00824 (D. Colo. Feb. 27, 2026).

2

risk of inconsistent adjudications.  All of the Towers Actions rest on the same fundamental factual questions, such as: Did the FCC require EchoStar to divest its spectrum assets?  Were the Required Sales Transactions "voluntary" business decisions, or were they required by the government?  Was EchoStar's potential loss of its spectrum licenses contemplated or foreseeable to DISH Wireless when it entered its contracts with the Towers Providers?  And, ultimately, did the FCC's actions, and the resulting Required Sales Transactions make it impossible for DISH Wireless to build, operate, or pay for a 5G wireless network?

The proper venue for the consolidated cases is the District of Colorado, which is centrally located and sits at the nexus of the alleged conduct underlying the Towers Actions.  Among other considerations, the District of Colorado is the location of (i) all defendants, including DISH Wireless (and the other three defendants named in any of the litigations, DISH Purchasing Corporation, DISH Wireless Leasing L.L.C., and EchoStar), (ii) the principal witnesses, (iii) the key evidence and documents, (iv) the majority of the alleged conduct, (iv) the first two filed cases, which are also the most advanced and have the highest claimed damages, and (v) four related state litigations pending in the District Court for the City and County of Denver, Colorado, two of which have already been consolidated.

## BACKGROUND

**The 5G Network Buildout.**  Beginning in 2008, EchoStar (and certain affiliates) invested over $30 billion to acquire a portfolio of spectrum licenses and related assets.  Since at least 2019, DISH Network Corporation ("DNC"), through its wholly-owned subsidiary DISH Wireless, and certain of its subsidiaries, was working to deploy a nationwide, first-of-its-kind cloud-native Open Radio Access Network-based 5G network, which depended entirely on the spectrum licenses and related assets that had been acquired by EchoStar (and certain affiliates) over the past decade.

**The FCC Actions.**  On May 9, 2025, the Chairman of the FCC sent a letter to the Chairman of EchoStar stating, among other things, that the FCC had initiated a review of EchoStar's licenses to provide 5G service in the United States and threatened the "loss of its spectrum licenses and significant financial payments."[2]  At that time, EchoStar was in full compliance with all buildout requirements.

On May 27, 2025, EchoStar filed comments on the FCC's public notices, noting the unprecedented nature of the inquiry given that "at no other time has the agency opened such inquiries after a company has invested billions into both acquiring spectrum and deploying a network in conformance with the agency's requirements."[3]  On June 6, 2025, EchoStar filed reply comments to the FCC, explaining that "[i]n reliance on that grant [from the FCC of a 2024 buildout extension], EchoStar has already made substantial investments and met its accelerated and expanded deployment commitments," and that reversal would be "pulling the rug out from under a licensee after the agency authorized and allocated spectrum and that licensee invested billions of dollars deploying it."[4]  These comments also noted the unprecedented nature of this inquiry.[5] During the ensuing weeks, EchoStar held numerous meetings at the highest levels of the FCC and the government to avoid the involuntary loss of the spectrum licenses, but ultimately was given no other available option to avoid license forfeiture.

**The Required Sale Transactions.**   As a result of the FCC's unprecedented and unforeseeable actions, which were unrelated to any of EchoStar's or DISH Wireless's obligations

---

[2] *See* May 9, 2025 Letter from Brendan Carr, FCC Chairman, to Charles W. Ergen, EchoStar Chairman of the Board (May 9, 2025), https://tinyurl.com/32zd8anr, at 2.
[3] *See* Comments of EchoStar (May 27, 2025), https://www.fcc.gov/ecfs/document/105280597605377/1, at 2–3).
[4] Reply Comments of EchoStar (June 6, 2025), https://www.fcc.gov/ecfs/document/10607392405127/1, at 1, 4) (internal quotations omitted).
[5] *Id.*

to the FCC, EchoStar was required to enter into the Required Sale Transactions, in which it sold certain spectrum licenses to AT&T, and other spectrum licenses and MSS Authorizations to SpaceX. The Required Sales Transactions were announced on August 26, 2025, September 8, 2025, and November 6, 2025.[6] The Required Sale Transactions make it impossible for DISH Wireless to continue to build, operate, or pay for a wireless network.

The Notices. In or around September 2025, DISH Wireless began issuing notices to its Towers Providers pursuant to their respective contracts, generally noting that the FCC's actions and the resulting Required Sales Transactions frustrated the principal purposes and completely destroyed the value of the parties' contracts and DISH Wireless's ability to perform. DISH Wireless further explained in these notices that the FCC required EchoStar to sell or forfeit the spectrum, that EchoStar's sale was involuntary and unavoidable, and that the FCC's actions were not 'contemplated' or 'foreseeable.' In addition, DISH Wireless noted that EchoStar invested billions of dollars into its spectrum and network buildout, which it would not have done if it expected to lose the spectrum notwithstanding meeting its license conditions. *Id.* DISH Wireless further explained that without the spectrum, there was no remaining purpose for its contracts with the Towers Providers, nor was there an ability to perform under them.

---

[6] Press Release, EchoStar Corp.*, EchoStar Announces Spectrum Sale and Hybrid Mobile Network Operator (MNO) Agreement, Steps Toward Resolving Federal Communications Commission's (FCC) Inquiries* (Aug. 26, 2025), https://ir.echostar.com/news-releases/news-release-details/echostar-announces-spectrum-sale-and-hybrid-mobile-network; Press Release, EchoStar Corp., *EchoStar Announces Spectrum Sale and Commercial Agreement with SpaceX* (Sept. 8, 2025), https://ir.echostar.com/news-releases/news-release-details/echostar-announces-spectrum-sale-and-commercial-agreement-spacex; Press Release, EchoStar Corp., *EchoStar Agrees to Sell Full Unpaired AWS-3 Spectrum License Portfolio to SpaceX* (Nov. 6, 2025), https://ir.echostar.com/news-releases/news-release-details/echostar-agrees-sell-full-unpaired-aws-3-spectrum-license.

**The Related Lawsuits.**  In the wake of DISH Wireless's delivery of these notices, numerous Towers Providers began initiating lawsuits challenging DISH Wireless's assertions regarding the involuntary nature of the Required Sales Transactions.  So far, there are eight federal Towers Actions spread across six federal district courts: two cases in the District of Colorado, two cases in the Central District of California, one case in the Eastern District of New York, one case in the Southern District of New York, one case in the Western District of New York, and one case in the Western District of Washington:

- *Aircom of Avon, LLC, et al. v. DISH Wireless L.L.C.*, Case No. 1:25-cv-03756 (Wang, J.) (D. Colo. Nov. 20, 2025) ("*Crown Castle*");

- *American Towers LLC, et al. v. DISH Wireless L.L.C.*, Case No. 1:25-cv-03311 (Crews, J.) (D. Colo. Oct. 20, 2025) ("*American Towers*");

- *BDR Sonata East LLC v. DISH Wireless L.L.C*, Case No. 2:26-cv-00574 (Evanson, J.) (W.D. Wash. Feb. 18, 2026) ("*BDR Sonata*");

- *Dataverge LLC v. DISH Wireless L.L.C*, Case No. 26-cv-01168 (E.D.N.Y. Feb. 27, 2026) ("*Dataverge*");

- *Royal Group Plaza, LLC v. DISH Wireless L.L.C.*, Case No. 2:26-cv-01092 (Rocconi, Mag. J.) (C.D. Cal. Feb. 3, 2026) ("*Royal Group Plaza*");

- *Sabre Industries, Inc. v. DISH Wireless Leasing L.L.C.*, (Vargas, J.) Case No. 1:26-cv-00209 (S.D.N.Y. Jan. 12, 2026) ("*Sabre Industries*");

- *SBA Telecommunications, LLC, et al. v. DISH Wireless L.L.C.*, (Vacca, J.) Case No. 1:26-cv-00218 (W.D.N.Y. Feb. 5, 2026) ("*SBA Telecommunications*"); and

- *Seidner Properties, LP v. DISH Wireless, LLC*, (Holcomb, J.) Case No. 8:26-cv-00082  (C.D. Cal. Jan. 26, 2026) ("*Seidner Properties*").

There are also four Towers Actions that have been filed in the state court for the City and County of Denver, Colorado, two of which have already been consolidated before the same judge, and one state court action pending in New York:

- *Zayo Group, LLC et al. v. DISH Wireless L.L.C*, 2025CV034300 (Colo. Dist. Ct., 2d Jud. Dist. Nov. 26, 2025);

6

- *Diamond Towers II LLC et al. v. DISH Wireless L.L.C*, 2026CV30222 (Colo. Dist. Ct., 2d Jud. Dist. Jan. 19, 2026);

- *Harmoni Towers Infrastructure LLC v. DISH Wireless L.L.C*, 2026CV30349 (Colo. Dist. Ct., 2d Jud. Dist. Feb. 2, 2026);

- *1 Source Towers, LLC, et al., v. DISH Wireless L.L.C*, 2026CV030478 (Colo. Dist. Ct., 2d Jud. Dist. Feb. 6, 2026); and

- *Titan Barnes LLC v. DISH Wireless L.L.C.*, 604856/2026 (N.Y. Sup. Ct. Feb. 19. 2026).

### LEGAL STANDARD

Transfer and consolidation are appropriate when actions in different judicial districts involve similar questions of fact such that consolidating pretrial proceedings would "promote the just and efficient conduct of such actions."  28 U.S.C. § 1407(a).  Section 1407 provides:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.

28 U.S.C. § 1407(a).  Under JPML Rule 6.2(a), "[a] party to an action may initiate proceedings to transfer under Section 1407 by filing a motion in accordance with these Rules."

### ARGUMENT

Because the allegations in the complaints filed in the Towers Actions are substantially similar and the cases involve common questions of fact, pretrial transfer and consolidation is appropriate.  The appropriate venue for transfer and consolidation of the Towers Actions is the District of Colorado in Denver, in which two of the relevant federal actions are already pending.

### I.     The Requirements Of 28 U.S.C. § 1407 Are Satisfied

Transfer, consolidation, and centralization are appropriate where the actions at issue (i) involve "one or more common questions of fact," and (ii) centralization "will be for the

convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). Both factors are easily satisfied here.

### A.  The Towers Actions Involve Common Questions of Fact

"[T]ransfer under Section 1407 does not require a complete identity or even majority of common factual issues as a prerequisite to transfer." *In re Ins. Brokerage Antitrust Litig.*, 360 F. Supp. 2d 1371, 1372 (J.P.M.L. 2005). Transfer has been found to be appropriate in cases involving claims of commercial impracticability in defendants' performance of their contractual obligations, as is at issue in the Towers Actions. *See In re Westinghouse Elec. Corp. Uranium Cont. Litig.*, 405 F. Supp. 316, 318-19 (J.P.M.L. 1975) (consolidating cases where defendant's performance of its contractual obligations was made "'commercially impracticable' by unforeseen circumstances outside of its control, and finding it "clear that common factual questions will be raised concerning the effect of [the] alleged unforeseen intervening circumstances"); *accord In re Acetaminophen - ASD/ADHD Prods. Liab. Litig.*, 637 F. Supp. 3d 1372, 1375 (J.P.M.L. 2022) (granting consolidation because "a single MDL is the most appropriate vehicle for resolving defendants' common defenses").

Here, the eight cases now before the Panel are based on the same facts and allegations arising out of the Required Sales Transactions, and DISH Wireless's affirmative defenses based on those Required Sales Transactions.[7] *See In re: CitiMortgage, Inc., Home Affordable*

---

[7] Indeed, a Colorado state court recently ordered consolidation of two related state cases that also arise out of the Required Sales Transactions based on, *inter alia*, their factual similarities. *See* Exhibit B, *Zayo Group, LLC et al. v. DISH Wireless L.L.C*, 2025CV034300, Feb. 11, 2026 *Order Granting Motion to Consolidate* (Colo. Dist. Ct., 2d Jud. Dist.) ("In both this action and the related *Diamond Action*, DISH [Wireless] is relying on the same underlying facts in an attempt to terminate its contractual obligations with Zayo and the Diamond Entities under the doctrines of force majeure, impossibility and frustration of purpose. It is therefore in the interests of litigation efficiency and judicial economy for this action and the related Diamond Action to be consolidated.")

8

*Modification Program (HAMP) Cont. Litig.*, 816 F. Supp. 2d 1375, 1376 (J.P.M.L. 2011) (granting centralization where the "actions share factual questions arising out of allegations that [defendant]…breached contracts" with various plaintiffs based on same course of action).  In particular, the Towers Providers have either expressly pled, or, in rebutting DISH Wireless's evidence in support of its affirmative defenses, will be required to show that the Required Sales Transactions were voluntary business decisions by EchoStar, and that EchoStar's nationwide loss of its spectrum licenses was foreseeable to DISH Wireless at the time of entering contracts with the Towers Providers.  For example, numerous Towers Actions Plaintiffs have expressly alleged that EchoStar's sale of its spectrum assets was a voluntary decision undertaken by EchoStar and not "forced" by the FCC:

- *American Towers*, Compl. ¶ 15 ("EchoStar was not 'forced' to sell its spectrum licenses by the FCC or anyone else.");

- *Crown Castle*, Compl. ¶ 94 ("Nor did the FCC 'force' EchoStar or DISH to take any action.  At no time did the FCC order EchoStar to sell its spectrum licenses. Instead, the AT&T and SpaceX Transactions are the result of business decisions entirely within the control of DISH and its affiliates.");

- *Royal Group Plaza*, Compl. ¶¶ 1, 37 ("DISH has unilaterally declared that it is excused from performing its obligations under the Agreement based on the … claim that a voluntary and highly profitable business decision by [EchoStar], to sell certain wireless spectrum licenses somehow constitutes a force majeure event…. The FCC never ordered EchoStar to sell its spectrum licenses.  At no point did the FCC or any other regulatory body or court order EchoStar to dispose of its spectrum assets.");

- *Sabre Industries*, Compl. ¶ 57 ("There is no evidence that the FCC forced or ordered EchoStar to sell their spectrum licenses.  The AT&T and SpaceX transactions were voluntary and intentional business decisions that were made entirely within the control of DISH and their affiliates.")

- *SBA Telecommunications*, Compl. ¶ 64 ("The AT&T and SpaceX Transactions were voluntary business decisions by EchoStar and its affiliates undertaken after the FCC initiated its inquiry…").

9

Thus, whether the sales were "forced" or "voluntary" will be a key factual contention in these cases. DISH Wireless will prove that the Required Sales Transactions were not voluntary, and that the FCC's actions were unforeseeable, unprecedented, frustrated the principal purposes and destroyed the value of the contracts with the Towers Providers, and eliminated DISH Wireless's ability to perform under those contracts. DISH Wireless will also show that EchoStar's required relinquishment of its licenses could not have been anticipated at the time of contracting with the Towers Providers, or when EchoStar invested billions of dollars into its spectrum and network buildout (which was premised on the availability of those licenses). Indeed, in those cases where DISH Wireless has already had to answer, DISH has expressly averred that the Required Sales Transactions were not voluntary or foreseeable. *See, e.g.*, *American Towers*, Answer, at 22-23 ("[T]he principal purpose of the [Agreements] … has been substantially frustrated by the FCC's unprecedented and unforeseeable regulatory actions … which compel[ed] the involuntary sale and loss of the spectrum licenses."); *Crown Castle*, Answer, at 27 (same).

In short, based on the Towers Providers' allegations and DISH Wireless's averred affirmative defenses, factual questions common to all cases will include, among other things:

(i)     the economics, industry custom and practices, and regulatory environment concerning the mobile wireless carrier industry and related contracts;

(ii)    whether EchoStar and certain of its affiliates had complied with any network build-out or other regulatory requirements imposed by the FCC prior to May 2025;

(iii)   whether and why the FCC changed course beginning in approximately May 2025 regarding the continued retention of spectrum licenses held by EchoStar and certain of its affiliates;

(iv)    what negotiations and other communications occurred between EchoStar and the FCC related to EchoStar's continued retention of the underlying spectrum licenses;

(v)     whether the Required Sales Transactions were "voluntary" business decisions, or involuntary and unavoidable actions that were only undertaken after EchoStar and

10

certain affiliates were required, after months of negotiations with the government, to relinquish the relevant spectrum licenses

(vi)    whether the Required Sale Transactions make it impossible for DISH Wireless to continue to build, operate, or pay for a wireless network; and

(vii)    whether the FCC's actions with respect to the Required Sales Transactions were unprecedented or otherwise could have been foreseeable to DISH Wireless at the time it entered into the required sales.

**B.    Consolidation And Transfer Will Promote Efficiency And Convenience**

Consolidation is particularly appropriate here because of the significant risk of inconsistent pretrial adjudications, the substantial duplication of effort and a waste of resources, and the unseemly race to judgment that would ensue absent centralization. *See, e.g.*, *In re Elec. Receptacle Prods. Liab. Litig.*, 313 F. Supp. 2d 1378, 1380 (J.P.M.L. April 8, 2004) ("Centralization under Section 1407 is … necessary in order to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary."); *In re MLR, LLC, Patent Litig.*, 269 F. Supp. 2d 1380, 1381 (J.P.M.L. July 1, 2003) (same); *In re Ford Motor Co. Crown Victoria Police Interceptor Prods. Liab. Litig.*, 229 F. Supp. 2d 1377, 1378 (J.P.M.L. 2002) (same).

Indeed, absent consolidation, DISH Wireless will be subjected to multiple duplicative discovery demands in at least eight different actions, and the same witnesses and counsel in all eight actions will be forced to travel across the country and participate in numerous redundant depositions, making the Towers Actions exponentially more time-consuming and expensive as the same or similar issues are litigated before different judges in different courts. *See, e.g.*, *In re Skelaxin (Metaxalone) Antitrust Litig.*, 856 F. Supp. 2d 1350, 1352 (J.P.M.L. 2012) (finding transfer appropriate where similar factual allegations "will likely require duplicative discovery and motion practice").

The very early stages of the Towers Actions also supports centralization. Only one case has proceeded beyond the pleading stage, and even it has only progressed to the very first phase of written discovery, where the parties have exchanged initial disclosures and plaintiff served its first requests for production only two weeks ago on February 17, 2026. *See Crown Castle*. DISH Wireless has yet to file a response to four of the cases. Thus, there is "ample scope to eliminate duplication and enhance the convenience of the parties, the witnesses, and the courts through coordinated proceedings in the MDL," and there are "benefits to coordinating pretrial motions, as none of the actions has advanced beyond motions to dismiss." *In re Generic Pharm. Pricing Antitrust Litig.*, 2017 WL 4582710, at *2.

### C.    Consolidation And Transfer Will Preserve Judicial Resources

If prosecuted separately, the Towers Actions would also necessitate duplicative work by at least eight separate district court judges, including with respect to discovery disputes, motion practice, and other pre-trial litigation and sundry matters arising in complex civil litigation, as the plaintiffs race to judgment. *In re Elect. Data Sys. Corp. Sec. & "ERISA" Litig.*, 254 F. Supp. 2d 1375, 1376 (J.P.M.L. 2003) (centralization is "necessary in order to eliminate duplicative discovery; prevent inconsistent pretrial rulings…and conserve the resources of the parties, their counsel and the judiciary"); *In re Schering Mktg. And Sales Prac. Litig.*, 502 F. Supp. 2d 1353, 1353-54 (J.P.M.L. 2007) (same); *In re Gen. Motors OnStar Contract Litig.*, 502 F. Supp. 2d 1357, 1358 (J.P.M.L. 2007) (same). This further supports centralization.

### II.    The Towers Actions Should Be Centralized Before The Honorable Nina Y. Wang In The District Of Colorado, Or In The Alternative, The Honorable S. Kato Crews

The JPML considers a multitude of factors in choosing the appropriate venue for transfer of a multi-district litigation. *See, e.g., In re Lithium Ion Batteries Antitrust Litig.*, 923 F. Supp. 2d 1370, 1371 (J.P.M.L. 2013); *In re FMC Corp. Patent Litig.*, 422 F. Supp. 1163, 1165 (J.P.M.L.

12

1976).  At bottom, the JMPL seeks to centralize in whatever district has the greatest nexus to the litigation.  *In re Century 21-Re/Max Real Estate Advertising Claim Litig.*, MDL 1008, 1994 WL 171221, at *1 (J.P.M.L. April 14, 1994) (selecting venue that "offers the greater nexus to the issues and parties"); *In re CP Ships Ltd. Securities Litig.*, 360 F. Supp. 2d 1369, 1370 (J.P.M.L. 2005) (transferring to district that "possesses a nexus to the litigation"); *In re Municipal Derivatives Antitrust Litig.*, 560 F. Supp. 2d 1386, 1387 (J.P.M.L. 2008) (transferring to venue that is the "center of gravity for this litigation").  Under any standard, the District of Colorado is the appropriate venue for consolidation, and the Honorable Nina Y. Wang, who currently presides over the most-procedurally-advanced litigation, *Crown Castle*, is the most appropriate judge.  In the alternative, the Honorable S. Kato Crews, who presides over the first-filed American Towers litigation, is also an appropriate choice.

### A.        The Defendants Reside In The District of Colorado

The location of the defendants—and, therefore, most of the evidence—is given considerable weight in deciding venue.  *See, e.g.*, *In re Pharmatrak, Inc., Privacy Litig.*, No. 1400, 2001 WL 34834422, at *1 (J.P.M.L. Apr. 18, 2001) (appropriate transferee district encompassed the headquarters of common defendant); *In re Computervision Corp. Sec. Litig.*, 814 F. Supp. 85, 86 (J.P.M.L. 1993) (same); *In re Bausch & Lomb Inc. Contact Lens Solution Prods. Liab. Litig.*, 444 F. Supp. 2d 1336, 1338 (J.P.M.L. 2006) (transferring to district where defendant's manufacturing facility was located).  This factor clearly weighs in favor of the District of Colorado.

In particular, DISH Wireless is headquartered in the Denver suburb of Englewood, Colorado, and maintains a campus in the Denver suburb of Littleton, Colorado, both of which are located in the District of Colorado.  *See, e.g.*, *In re Skelaxin (Metaxalone) Antitrust Litig.*, 856 F. Supp. 2d at 1352 (transferring to the district where defendant was headquartered); *In re CP Ships*

*Ltd. Sec. Litig.*, 360 F. Supp. 2d at 1370 (transferee district "possesse[d] a nexus to the litigation" because it was where the main defendant had its major domestic office). Further, the three other defendants named in two of the Towers Actions that would be subject to consolidation, EchoStar, DISH Wireless Leasing L.L.C., and DISH Purchasing Corporation, are all also located in the District of Colorado.

Conversely, the named plaintiffs in the Towers Actions are variously located in, *inter alia*, California, Massachusetts, New York, and Washington. Because the named plaintiffs are located throughout the United States, there is no single district that is most convenient to the plaintiffs, and any given plaintiff's choice of venue is not a significant factor. *See, e.g.*, *In re BP P.L.C. Sec. Litig.*, 734 F. Supp. 2d 1376, 1379 (J.P.M.L. 2010) ("Because potential plaintiffs and putative class members will reside in every corner of the country, the location of the currently filed cases is not a particularly important factor in our decision.").

**B.      The Relevant Discovery Is Located In The District of Colorado**

The Panel has regularly found that related cases are appropriately transferred to the district where the majority of relevant witnesses, evidence, and documents are located. *In re I.R.S. § 1031 Tax Deferred Exchange Litig.*, 528 F. Supp. 2d 1343, 1344 (J.P.M.L. Oct. 18, 2007) (transferring to the district that was the "likely source of relevant documents and witnesses…"); *In re N.Y.C. Municipal Secs. Litig.*, 439 F. Supp. 267, 270 (J.P.M.L. Nov. 1, 1977) (same); *In re Skelaxin*, 856 F. Supp. 2d at 1352 (transferring to where defendant was headquartered). Here, it is beyond dispute that the overwhelming majority of relevant witnesses, evidence and documents are located in Colorado. *In re UnumProvident Corp. Secs., Derivative, & "ERISA" Litig.*, 280 F. Supp. 2d 1377, 1380 (J.P.M.L. Sept. 2, 2003) (transferring to forum because, in addition to being location of main defendant's headquarters, it was where witnesses and documents would be found).

14

*First*, the majority of the alleged conduct underlying the allegations in the Towers Actions took place in Englewood or Littleton in the District of Colorado.  For example, the Towers Providers' contracts were negotiated by DISH Wireless employees based in Englewood or Littleton, Colorado.  Furthermore, EchoStar is headquartered in Colorado, and many of EchoStar's communications with the FCC, as well as negotiations with its counterparties in the Required Sales Transactions, were conducted by EchoStar employees based in Englewood or Littleton, Colorado.

*Second*, the vast majority of relevant documents are located in Englewood at DISH Wireless's and EchoStar's headquarters, or in the Littleton campus, both of which are less than 20 miles from Denver's federal courthouse.  Even in era of e-discovery, the location of relevant documents, is a significant factor in selecting venue.  *See, e.g.*, *In re Living Social Mktg. & Sales Practices Litig.*, 807 F. Supp. 2d 1379, 1380 (J.P.M.L. 2011) (ordering consolidation and transfer to district where documents were located even though defendant was electronic-medium based company offering internet-based product).

*Third*, a majority of the key witnesses are based out of DISH Wireless's and EchoStar's headquarters in Englewood, Colorado, or campus in Littleton, Colorado, which also weighs in favor of Colorado as the chosen venue.  *In re Glucagon-Like Peptide-1 Receptor Agonists Prods. Liability Litig.*, 717 F. Supp. 3d 1370, 1374 (J.P.M.L. 2024) (granting transfer to district close to defendant's headquarters where many of the relevant witnesses and documents were located).

### C.    The First Two Towers Actions Were Filed In The District of Colorado

Another factor that the Panel evaluates is which district has the actions that were first-filed or most advanced.  *See, e.g.*, *Peixoto de Azeveda Air Crash*, 493 F. Supp. 2d 1374, 1376 (J.P.M.L. 2007) (transfer to district with earliest filed and most procedurally advanced actions); *In re JP Morgan Chase & Co.*, 452 F. Supp. 2d 1350, 1351 (J.P.M.L. 2006) (same).  Here, the first two

Towers Actions that were filed against DISH Wireless, *American Towers* and *Crown Castle*, were both filed in the District of Colorado. These are also, not coincidentally, the cases that are the most procedurally advanced and have the highest alleged damages, with the *Crown Castle* matter being in the initial stages of discovery, and the *American Towers* case having a pending motion for judgment on the pleadings. This further supports the District of Colorado as the appropriate transferee district.

### D.      The District of Colorado Has The Requisite Expertise And Capacity

The District of Colorado also has the expertise and capacity to manage an MDL proceeding. This was confirmed by the Panel as recently as October 2025 when, in transferring to the District of Colorado its first MDL in 16 years,[8] the Panel noted that its decision offered the "opportunity to assign an MDL to an underutilized district that has the capacity to manage the litigation efficiently." *In re Archery Prods. Antitrust Litig.*, 2025 WL 2937322, at *2 (J.P.M.L. Oct. 16, 2025).

The underutilization of the District of Colorado also makes its present docket situation particularly favorable. With 16 district and senior judges and only one pending MDL action,[9] the District of Colorado has the capacity to handle a second MDL,[10] and many skilled jurists who have

---

[8] *Archery Antitrust Actions Headed to Colorado, the State's First MDL in 16 Years*, (Law.com Oct. 20, 2015), https://www.law.com/2025/10/20/archery-antitrust-actions-headed-to-colorado-the-states-first-mdl-in-16-years/?slreturn=20260218104916.

[9] MDL Statistics Report – Distribution of Pending MDL Dockets, United States Judicial Panel on Multidistrict Litigation (February 2, 2026), https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-February-2-2026.pdf.

[10] According to the Federal Court Management Statistics for the 12-month period ending December 31, 2025, the median time from filing to disposition for civil cases in the District of Colorado is 7.5 months. Moreover, there are currently 4,772 cases pending in the District of Colorado, an average of 682 per judge. *Federal Court Management Statistics – Comparison Within Circuit* (December 31, 2025), https://www.uscourts.gov/sites/default/files/document/fcms_na_distcomparison1231.2025.pdf.

not had the opportunity to preside over one, including Judge Wang, who presides over the *Crown Castle* litigation, and Judge Crews, who presides over the *American Towers* litigation.  *See In re: Packaged Antitrust Litig.*, 560 F. Supp. 2d 1359, 1361 (J.P.M.L. 2008) (transferring case to "geographically central district with favorable caseload conditions" and more pending actions than any other venue); *In re Serzone Prods. Liability Litig.*, 217 F. Supp. 2d 1372, 1374 (J.P.M.L. 2002) (preferencing transferee district that is "not currently overtaxed with other multidistrict dockets"); *In re Dividend Solar Fin., LLC, & Fifth Third Bank Sales & Lending Pracs. Litig.*, 753 F. Supp. 3d 1365, 1367 (J.P.M.L. 2024) (selecting "a skilled jurist who has not yet had the opportunity to preside over an MDL" in a district with one of the actions to be centralized).

### E.    The District Of Colorado Is The Geographic Center Of The Towers Actions

The District of Colorado also serves as a geographically central location for litigation that is already national in scope.  *See, e.g.*, *In re St. Jude Med., Inc. Silzone Heart Valves Prods. Liab. Litig.*, MDL 1396, 2001 WL 36292052, at \*2 (J.P.M.L. Apr. 18, 2001) (noting "wide array of suitable transferee districts" but ultimately transferring to the situs of defendant's headquarters and "forum geographically central for a litigation already nationwide in scope").

The Panel has repeatedly expressed its preference for a centrally located transferee district. *See, e.g.*, *In re Kaba Simplex Locks Mktg. & Sales Practices Litig.*, 764 F. Supp. 2d 1339, 1340 (J.P.M.L. 2011) (transferring to district "relatively centrally-located for this nationwide litigation" and "accessible for the parties"); *In re Wells Fargo Wage & Hour Emp't Prac. Litig. (No. III)*, 804 F. Supp. 2d 1382, 1384-85 (J.P.M.L. 2011) (transferring to district "geographically centrally located" and "accessible for parties and witnesses located throughout the United States"); *In re Teflon Prods. Liab. Litig.*, 416 F. Supp. 2d 1364, 1365 (J.P.M.L. 2006) (transferring to "geographically central location"); *In re TJX Companies, Inc.*, 505 F. Supp. 2d 1379, 1380

17

(J.P.M.L. 2007) (transferring to district "centrally located").  In fact, even though there are already two Towers Actions pending in the district, centrality has been found to trump the absence of a pending action.  *See, e.g., In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 269 F. Supp. 2d 1372, 1373 (J.P.M.L. 2003) (finding transfer to situs of alleged conduct proper, despite absence of pending action there).

Here, the Towers Actions were filed by plaintiffs and their counsel in venues as far east as New York City, as far west as Santa Ana, California, and as far north as Seattle, Washington, as well as in and around Denver, Colorado itself.  As demonstrated by the below map, Denver, Colorado, is geographically central to all the pending Towers Actions and to where the plaintiffs are located:



## F.      The District Of Colorado Is Readily Accessible

The relative accessibility of Denver also weighs in favor of centralization there.  *In re Res. Exploration, Inc., Secs. Litig*, 483 F. Supp. 817, 822–23 (J.P.M.L. 1980) (transferring to the district

that was "far more convenient and accessibl[e] forum for the parties").  Denver has the nation's third largest airport by annual passengers served, and first largest by size, and is serviced by all major domestic carriers, including Delta, United, and American Airlines, with daily non-stop flights to over 200 destinations.[11]  As the gateway to the Rockies, Denver is also a major business and tourist destination with an infrastructure that can readily accommodate travelers from all over the country.[12]

G.    **Several Related State Court Litigations Are Pending In The District Of Colorado**

Another factor considered by the JPML is the pendency of a related state court action.  *In re Nexium (Esomeprazole) Prods. Liab. Litig.*, 908 F. Supp. 2d 1362, 1365 (J.P.M.L. 2012) (transferring to district that would "facilitate coordination with pending state court litigation"); *In re UnumProvident Corp. Secs., Derivative, & "ERISA" Litig.*, 280 F. Supp. 2d at 1380 (transferring to forum because centralization there "will facilitate coordination between the federal court actions and related state court litigation pending in [forum]").  This factor weighs overwhelmingly in favor of the District of Colorado, as there are currently four related state court cases pending in the District Court for the City and County of Denver, Colorado.  *See supra* at p. 7.  Two of these cases have already been consolidated with each other, with a possibility that the other two might be as well.  Accordingly, transfer to the District of Colorado will facilitate coordination with these pending state court cases in Denver.

---

[11]  *Domestic Nonstop Destinations from Denver*, (last accessed Feb. 27, 2026), https://www.flydenver.com/nonstop-routes/.
[12]  *Visit Denver*, (last accessed Feb. 27, 2026), https://visitdenver.com/

19

## CONCLUSION

For the foregoing reasons, DISH Wireless respectfully requests that the Panel grant this petition to transfer, consolidate, and centralize the Towers Actions under 28 U.S.C. § 1407 to the United States District Court for the District of Colorado.


Dated: March 2, 2026                                        Respectfully submitted,



By: */s/ Glenn M. Kurtz*
Glenn M. Kurtz
Joshua D. Weedman
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY 10020
Phone: 212.819.8200
Fax: 212.354.8113
gkurtz@whitecase.com
jweedman@whitecase.com

*Attorney for Defendant DISH Wireless*

20