# Exhibit 1

# Redacted Complaint

# *Comcast Business Commc'ns, LLC, v. DISH Wireless L.L.C., et al.*

U.S. District Court for the District of Colorado

Civil Action No. 1:26-cv-00824

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. __1:26-cv-00824_____

COMCAST BUSINESS COMMUNICATIONS, LLC,

      Plaintiff,

v.

DISH WIRELESS L.L.C. and ECHOSTAR CORPORATION,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Comcast Business Communications, LLC ("Comcast"), by and through its undersigned counsel, files this Complaint against DISH Wireless L.L.C. ("DISH") and EchoStar Corporation ("EchoStar"), alleging as follows:

**INTRODUCTION**

1. This action is rooted in DISH's attempt to avoid its binding contractual obligations to pay Comcast for fiber connectivity through a baseless invocation of force majeure and frustration of purpose. Far from suffering an act of God or facing some unforeseeable roadblock, however, DISH—acting at its parent company EchoStar's direction—seeks to evade its legal responsibilities solely due to ordinary and eminently foreseeable business decisions.

2. In 2019, DISH announced plans to enter the marketplace for mobile wireless services and deploy a nationwide, state-of-the-art ("5G") wireless network. As part of those efforts, DISH entered into a Master Service Agreement ("MSA") with Comcast on April 30, 2021,

1

under which Comcast would provide fiber connections to DISH's cell sites. This service is known as "cell backhaul," enabling the transmission of voice and data traffic between cell sites and network hubs and allowing for connectivity to the broader Internet and other services. Since entering into the MSA, DISH has ordered—and Comcast has provisioned—nearly 2,400 of these fiber connections for cell backhaul service in exchange for fees payable by DISH to Comcast.

3. DISH also planned to use radiofrequency spectrum licensed by the Federal Communications Commission ("FCC") to enable wireless communications between cell sites and customers' mobile devices. DISH's corporate parent prior to 2023, DISH Network Corporation, held numerous FCC spectrum licenses across various frequency bands. To obtain and maintain those licenses, DISH Network Corporation made a series of buildout commitments to the FCC, including a promise that DISH's 5G wireless network would reach 75 percent of the population in its spectrum license areas by 2025.

4. In 2023, DISH Network Corporation merged with EchoStar, becoming a wholly owned subsidiary. In the merger, DISH Network Corporation voluntarily transferred a significant portion of its spectrum licenses to EchoStar and a newly formed subsidiary. Through the merger and transfer of spectrum licenses, EchoStar assumed DISH Network Corporation's 5G buildout commitments. Charlie Ergen is the Chairman of the Board of both companies (and of DISH Wireless L.L.C.).

5. Throughout the relevant time period, DISH Network Corporation and later EchoStar faced certain challenges in meeting their buildout commitments but consistently maintained that they were on track to satisfy them. In 2024, EchoStar received extensions for some of these commitments from the FCC.

6.      In May 2025, the FCC opened an investigation into EchoStar's compliance with its regulatory obligations.  Before and after the FCC's initiation of that inquiry, EchoStar maintained that it had fully complied with its regulatory commitments.  In its comments to the FCC and in its Form 8-K filed with the Securities and Exchange Commission ("SEC"), for example, EchoStar insisted that it "met or exceeded" all its buildout obligations.[1]  Further, EchoStar declared that any modification or revocation of its spectrum licenses by the FCC would be "unlawful, unconstitutional, discriminatory, and utterly baseless."[2]

7.      Notwithstanding EchoStar's insistence that it was entitled to retain all its licenses, EchoStar decided in the latter half of 2025 to sell its spectrum licenses in a series of highly lucrative deals.  In August 2025, EchoStar announced that it had decided to sell its 3.45 GHz and 600 MHz spectrum licenses to AT&T for approximately $23 billion.  One month later, EchoStar announced it would sell its AWS-4 and H-block spectrum licenses to SpaceX for approximately $17 billion.  Further, in November 2025, EchoStar announced it would also sell its unpaired AWS-3 to SpaceX for an additional $2.6 billion.  These deals—which are awaiting regulatory approval by the FCC— have a total value of over $42 billion.

8.      Meanwhile, in September 2025, FCC Chairman Brendan Carr directed his staff to bring the agency's investigation into EchoStar's spectrum utilization "to conclusion."[3]  He

---

[1] Comments of EchoStar Corporation, SB Docket No. 25-173, at 9 (filed May 27, 2025), https://www.fcc.gov/ecfs/document/105280597605377/1; EchoStar Corporation, Form 8-K, Item 8.01 (May 13, 2025), https://ir.echostar.com/static-files/31f3efd9-c8a8-46c9-926e-634502de1e04

[2] Reply Comments of EchoStar Corporation, SB Docket No. 25-173, at 6 (filed June 6, 2025), https://www.fcc.gov/ecfs/document/10607392405127/1

[3] EchoStar Corporation, Form 8-K, Exhibit 99.1 (Sept. 9, 2025), https://ir.echostar.com/static-files/3e5fc713-bbd0-472e-bf75-7cecf1282c48

indicated that the agency found "that relevant FCC buildout and other related obligations have been satisfied by EchoStar in view of the company's current FCC milestones."[4] At no point during this process did the FCC issue an order finding any violation of law, much less requiring EchoStar to sell its spectrum licenses.

9.    In conjunction with these voluntary transactions, EchoStar announced that DISH will pivot to a business model under which customers will receive mobile wireless services primarily through network infrastructure and spectrum obtained from other wireless carriers, rather than relying principally on EchoStar's wireless licenses. EchoStar claimed that this development will greatly enhance DISH's competitive stance and range of offerings.

10.    Once EchoStar decided to change its business strategy—from relying on its own spectrum licenses and infrastructure arrangements to deploy a new nationwide wireless network, to relying on the spectrum and network infrastructure of other wireless carriers to offer service— EchoStar orchestrated an unlawful scheme to disentangle DISH from its contractual commitments to Comcast and other infrastructure providers. In particular, EchoStar directed DISH to assert that it is no longer required to honor its contractual obligations to Comcast by improperly invoking the force majeure provision under the MSA and baselessly alleging frustration of purpose.

11.    On September 25, 2025, DISH sent a letter to Comcast suggesting that its contractual obligations under the MSA were excused due to force majeure and frustration of purpose.[5] Contrary to both the facts and the law, DISH erroneously declared that "the FCC's

---

[4] *Id.*

[5] Other entities received similar letters and have already sued DISH for its misguided attempts to evade its contractual obligations. *See Branch Towers III LLC v. DISH Wireless L.L.C.*, No.

actions and the resulting spectrum sales have frustrated the principal purpose and completely destroyed the value of the Agreement and DISH Wireless's ability to perform," and therefore nullified the MSA. At the same time, DISH insisted that it "need[ed] to continue to operate certain Services (as defined in the Agreement) for a period of time," thereby purporting to hold Comcast to its contractual obligations while refuting its own.

12. The reality, however, is that DISH's supposed inability to perform stems not from an act of God or some unforeseeable event but from EchoStar's voluntary and self-motivated business decision to sell certain terrestrial spectrum licenses. That decision is precisely the kind of ██████████████████████████████████████ that the MSA expressly excludes from its "force majeure" provision. Any actions taken by the FCC against EchoStar have nothing to do with DISH's obligations to perform under the MSA with Comcast. DISH's reference to "the FCC's actions" in asserting force majeure is particularly frivolous because, as noted above, the FCC has never issued an order revoking or forcing EchoStar to sell any of its spectrum licenses. To the contrary, the FCC concluded its short-lived investigation into EchoStar by finding that EchoStar had satisfied the relevant buildout requirements.

---

26cv30478 (Colo Dist. Ct. filed Feb. 9, 2026); *SBA Telecommunications, LLC v. DISH Wireless L.L.C.*, No. 1:26-cv-00218-MAV (W.D.N.Y. filed Feb. 5, 2026); *Royal Group Plaza, LLC v. DISH Wireless L.L.C.*, No. 2:26-cv-01092 (C.D. Cal. filed Feb. 3, 2026); *DataVerge LLC v. DISH Wireless L.L.C.*, No. 503203/2026 (N.Y. Sup. Ct., Kings Cnty. filed Jan. 28, 2026); *Diamond Towers II LLC v. DISH Wireless L.L.C.*, No. 2026CV30222 (Colo Dist. Ct. filed Jan. 19, 2026); *Sabre Indus., Inc. v. DISH Wireless Leasing L.L.C.*, No. 1:26-cv-00209-JAC (S.D.N.Y. filed Jan. 12, 2026); *Zayo Group, LLC v. DISH Wireless, L.L.C.*, No. 2025CV34300 (Colo Dist. Ct. filed Nov. 26, 2025); *Aircomm of Avon, LLC v. DISH Wireless, L.L.C.*, No. 1:25-cv-03756 (D. Colo. filed Nov. 20, 2025); *Am. Towers LLC v. DISH Wireless, L.L.C.*, No. 1:25-cv-3311 (D. Colo. filed Oct. 20, 2025).

13.    Moreover, it was always foreseeable that EchoStar would face FCC scrutiny into buildout compliance or decide to sell its terrestrial spectrum licenses; regulatory investigations and spectrum sales are commonplace in the industry.  DISH could have added a provision to the MSA that would have enabled it to terminate the agreement and avoid fees in such circumstances.  But it chose not to do so and instead agreed to an MSA containing, among other things, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮  Since receiving DISH's September 25 letter, Comcast has been issuing invoices to DISH for ▮▮▮ in accordance with the MSA—and by failing to pay these ▮▮▮ as they come due, DISH is already in breach of the MSA.

14.    Furthermore, even after the spectrum sales, DISH can still perform under the MSA. EchoStar will retain several spectrum licenses, while DISH anticipates maintaining a strong subscriber base, indicating that it could continue to deploy a 5G network.  This, along with DISH's insistence on Comcast's continued performance, further indicates that any claimed frustration is immaterial and that the MSA still holds value to DISH.  In all events, DISH cannot avoid its express contractual obligations in the MSA by invoking obviously inapplicable provisions addressing force majeure or erroneously claiming frustration of purpose—and EchoStar cannot avoid liability for intentionally inducing DISH's breach.  Accordingly, Comcast seeks a declaratory judgment that (i) no force majeure or frustration of purpose occurred under the MSA; (ii) DISH is not excused from performing its obligations under the MSA; (iii) the MSA remains in full force and effect; and (iv) DISH remains obligated to perform all its obligations under the MSA. Comcast also seeks damages for EchoStar's tortious interference with the MSA, amounting to at least $54,111,313.44 as of the date of this Complaint, and continuing to accrue.

6

**PARTIES**

15. Plaintiff Comcast Business Communications, LLC is a Pennsylvania limited liability company, with its principal place of business in Philadelphia, Pennsylvania. It is therefore a citizen of Pennsylvania. It is a signatory of the MSA.

16. Defendant DISH Wireless L.L.C. is a Colorado limited liability company, with its principal place of business in Englewood, Colorado. It is therefore a citizen of Colorado. DISH is a wholly owned subsidiary of EchoStar Corporation and a signatory of the MSA. Before the 2023 merger of DISH Network Corporation and EchoStar Corporation, DISH was a wholly owned subsidiary of DISH Network Corporation.

17. Defendant EchoStar Corporation is a Nevada corporation that is headquartered in Englewood, Colorado. It is therefore a citizen of Nevada and Colorado. EchoStar is the ultimate parent of DISH but was not a signatory of the MSA.

**JURISDICTION AND VENUE**

18. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

19. This Court has general and specific personal jurisdiction over DISH and EchoStar. The exercise of general personal jurisdiction is proper because DISH and EchoStar are headquartered in and maintain their principal places of business in this District, rendering them at home in this forum. The exercise of specific personal jurisdiction is proper because the claims in this action arise out of and relate to DISH's and EchoStar's conduct and activities within this District. Additionally, DISH and EchoStar have sufficient minimum contacts with this District

7

such that the Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because DISH and EchoStar reside in this District.

## FACTUAL ALLEGATIONS

**A.     DISH Entered the Mobile Wireless Market in 2019 and Made Aggressive 5G Buildout Commitments**

21.     In 2019, DISH entered the mobile wireless market as the fourth nationwide carrier. Its stated goal was to build a nationwide 5G wireless network.

22.     That same year, as part of a divestiture ordered by the FCC in approving T-Mobile US, Inc.'s acquisition of Sprint Corporation and a related consent decree entered into with the Department of Justice, DISH Network Corporation agreed to buy Sprint's prepaid mobile brand Boost Mobile.  As a condition of that transaction, DISH Network Corporation agreed with the FCC to a series of buildout obligations on what it acknowledged was an "aggressive schedule" and "accelerated timeline."[6]  Specifically, DISH Network Corporation promised to deploy 5G broadband service to 20 percent of the U.S. population by 2022; to 70 percent of the U.S. population by 2023; and to 75 percent of its spectrum license areas by 2025.  DISH Network Corporation also agreed that if it failed to meet the deadlines, it would pay up to $2.2 billion to the FCC and would forfeit certain spectrum licenses.

---

[6] Letter from Jeffrey H. Blum, DISH to Donald Stockdale, Chief, Wireless Telecommunications Bureau, FCC (July 26, 2019), https://www.fcc.gov/sites/default/files/dish-letter-07262019.pdf.

### B.    DISH and Comcast Signed the MSA in 2021

23.    In furtherance of its parent company's network buildout commitments and its retail service plans, DISH entered into strategic partnerships with various service providers, including Comcast.

24.    DISH and Comcast signed the MSA on April 30, 2021.  Under the terms of the MSA, Comcast provides DISH with cell backhaul services in exchange for fees payable by DISH to Comcast as specified in the MSA.  A true and correct copy of the MSA is attached hereto as **Exhibit A**.







31.    Pursuant to the MSA, DISH has ordered, and Comcast has provisioned, cell backhaul to nearly 2,400 sites.

**C.    DISH's Parent Companies Experienced Challenges in Meeting FCC Buildout Obligations but Consistently Asserted They Were in Compliance**

32.    Meanwhile, DISH's parent companies (first, DISH Network Corporation, and later, EchoStar) experienced some difficulties in living up to their public commitments and FCC-mandated deadlines in building out the planned 5G wireless network.  Nevertheless, DISH

11

Network Corporation denied any wrongdoing and consistently maintained that it was in compliance.

33.    For instance, in its 2022 Form 10-K, DISH Network Corporation announced that it had "successfully reached [its] 20% population coverage requirement" and was on track to meet the deadline for offering 5G service to at least 70% of the U.S. population.[7]  In its Form 10-K the following year, DISH Network Corporation announced that it had made considerable strides in achieving its buildout obligations, stating that "the FCC confirmed [it] [had] met all of [its] June 14, 2023 band-specific 5G deployment commitments, and two of [its] three nationwide 5G commitments."[8]  It further declared: "The single remaining 5G commitment, that at least 70% of the U.S. population has access to average download speeds equal to 35 Mbps, was confirmed using the drive test methodology agreed to and approved by the FCC and overseen by an independent monitor."[9]

34.    In 2023, amid its stated compliance with the buildout obligations, DISH Network Corporation merged with and became a wholly owned subsidiary of EchoStar, with Charlie Ergen serving as the Chairman of the Board of both companies (and DISH Wireless L.L.C.).  DISH Network Corporation also transferred a substantial portion of its spectrum licenses to EchoStar and a newly formed subsidiary.  Discussing the merger, Mr. Ergen asserted that "DISH's

---

[7] DISH Network Corporation, Form 10-K, at 5 (Feb. 23, 2023), https://www.sec.gov/Archives/edgar/data/1001082/000155837023001811/dish-20221231x10k.htm.

[8] DISH Network Corporation, Form 10-K, at 3 (Mar. 29, 2024), https://www.sec.gov/Archives/edgar/data/1001082/000155837024004386/dish-20231231x10k.htm.

[9] *Id.*

substantial past investments in spectrum and its wireless buildout" would help "drive long-term value creation for our shareholders and other stakeholders."[10]

35.     In a September 2024 letter to the FCC on joint EchoStar/DISH letterhead, EchoStar requested an extension for its construction milestones.  The FCC granted that request.

### D.     The FCC Launched an Investigation into EchoStar's Compliance with Its Regulatory Obligations

36.     In May 2025, the FCC launched an inquiry into EchoStar's compliance with its buildout requirements.  Specifically, on May 9, 2025, Chairman Carr wrote a letter to EchoStar in which he explained that he had requested a staff review of EchoStar's compliance with its buildout obligations.  Outlining EchoStar's history of extensions and missed milestones, Chairman Carr's letter also stated that the FCC would seek public comment on a pending petition for reconsideration for the agency's 2024 extension of EchoStar's buildout obligations.

37.     In response, EchoStar maintained that it had fully complied with its buildout commitments.  In its May 27, 2025 comments to the FCC, EchoStar insisted that it "met or exceeded all of the milestones, commitments, and obligations that the Commission imposed as conditions of its licenses."[11]  EchoStar also contested the legality of the FCC's threatened sanctions, characterizing them as "unlawful" and "unjustified."[12]  Further, EchoStar declared that any modification or revocation of its spectrum licenses by the FCC would be "unlawful,

---

[10] DISH, Press Release, "DISH Network Corporation and EchoStar Corporation to Combine," Aug. 8, 2023, https://about.dish.com/2023-08-08-DISH-Network-Corporation-and-EchoStar-Corporation-to-Combine.

[11] Comments of EchoStar Corporation, SB Docket No. 25-173, at 9 (filed May 27, 2025), https://www.fcc.gov/ecfs/document/105280597605377/1.

[12] *Id.* at 12.

unconstitutional, discriminatory, and utterly baseless."[13]  Later, it contended that if the FCC had attempted to revoke its licenses, EchoStar "would [have] w[o]n the battle."[14]

> **E.    Far from Being Forced by the FCC, EchoStar Voluntarily Sold Spectrum Licenses in Highly Lucrative Transactions**

38.    Rather than continuing to make the case that it met its buildout obligations—or awaiting (and then challenging) a possible order from the FCC finding that it was out of compliance—EchoStar decided to sell its terrestrial spectrum licenses in a series of voluntary and highly profitable transactions beginning in August 2025.  To be clear, the FCC never issued an order requiring EchoStar to sell its spectrum licenses; it merely opened an investigation into EchoStar's utilization of spectrum and ultimately found that EchoStar was in compliance with its deployment obligations.  EchoStar's spectrum sales thus were purely voluntary business decisions.

39.    On August 26, 2025, EchoStar announced that it had entered into an agreement to sell its 3.45 GHz and 600 MHz spectrum licenses to AT&T for approximately $23 billion.  On September 8, 2025, EchoStar announced that it had entered into an agreement to sell its AWS-4 and H-block spectrum licenses to SpaceX for approximately $17 billion.  And on November 6, 2025, EchoStar announced that it had entered into an agreement to sell its unpaired AWS-3 licenses to SpaceX for approximately $2.6 billion.  All of these deals are now awaiting the FCC's regulatory approval.  These deals—with a combined value of over *$42 billion*—have been highly lucrative for EchoStar.    Even AT&T's CEO John Stankey acknowledged that the company paid

---

[13] Reply Comments of EchoStar Corporation, SB Docket No. 25-173, at 6 (filed June 6, 2025), https://www.fcc.gov/ecfs/document/10607392405127/1.

[14] Leslie Stimson, *EchoStar is Ready to 'Pivot,'* INSIDE TOWERS (Sept. 22, 2025), https://insidetowers.com/echostar-is-ready-to-pivot/.

considerably more for the spectrum licenses than DISH Network Corporation initially paid at auction. Further, EchoStar told investors that the transactions have improved the company's strategic positioning and growth potential. Moving forward, the company is transitioning Boost Mobile to a business model under which customers will receive mobile wireless services primarily through network infrastructure and spectrum obtained from other wireless carriers. EchoStar's CEO and President Hamid Akhavan publicly asserted that DISH is positioned more favorably than it has ever been, with Boost Mobile's revenues and subscriber levels increasing at the end of 2025 as it continues to attract new customers.

**F.     At EchoStar's Direction, DISH Erroneously Claimed Its Contractual Obligations Were Excused**

40.     EchoStar's change in business strategy—from relying on its own spectrum licenses and infrastructure arrangements to deploy a new nationwide wireless network through its subsidiary DISH, to relying on the spectrum and network infrastructure of other wireless carriers to offer service—did not relieve DISH of contractual commitments associated with its earlier plans. DISH had entered into agreements with Comcast and various other infrastructure providers to support its planned deployment of a nationwide 5G wireless network. But those agreements became inconvenient once EchoStar abandoned its plan to build out a new network. Thus, on information and belief, EchoStar orchestrated a self-serving and lucrative scheme whereby DISH would attempt to free itself of its contractual obligations, based on trumped up invocations of force majeure and frustration of purpose.

41.     In a November 2025 earnings call, EchoStar's Chairman Ergen telegraphed the company's strategy for DISH's repudiation of its contracts. On the call, Mr. Ergen claimed that the FCC's investigation was "a force majeure event" that excused DISH's performance of its

agreements with infrastructure providers.[15]  Mr. Ergen also acknowledged that "[w]e also have other vendors and people we've worked with for a long time that are affected by that," and said that "[w]e'll work with" DISH's vendors to "try to resolve those issues."[16]  The clear upshot of Mr. Ergen's comments was that DISH would be disclaiming its contractual commitments and that affected vendors should be prepared to receive less than they were owed under the contracts.

42.      In keeping with this plan, DISH quickly attempted to extricate itself from its legal commitments, including contracts with cell tower facilities, equipment suppliers, and providers of fiber infrastructure, such as Comcast.[17]  On September 25, 2025, DISH sent Comcast a letter baselessly asserting that its contractual obligations were excused due to force majeure and frustration of purpose.  Contrary to both the facts and the law, DISH declared that "the FCC's actions and the resulting spectrum sales have frustrated the principal purpose and completely destroyed the value of the Agreement and DISH Wireless's ability to perform."  As the result of supposedly "unforeseeable actions by the FCC taken outside of DISH Wireless's control," it

---

[15] *EchoStar Corporation (SATS) Q3 FY2025 earnings call transcript*, YAHOO FINANCE (Nov. 6, 2025), https://finance.yahoo.com/quote/SATS/earnings/SATS-Q3-2025-earnings_call-369743.html.

[16] *Id.*

[17] *See Branch Towers III LLC v. DISH Wireless L.L.C.*, No. 26cv30478 (Colo Dist. Ct. filed Feb. 9, 2026); *SBA Telecommunications, LLC v. DISH Wireless L.L.C.*, No. 1:26-cv-00218-MAV (W.D.N.Y. filed Feb. 5, 2026); *Royal Group Plaza, LLC v. DISH Wireless L.L.C.*, No. 2:26-cv-01092 (C.D. Cal. filed Feb. 3, 2026); *DataVerge LLC v. DISH Wireless L.L.C.*, No. 503203/2026 (N.Y. Sup. Ct., Kings Cnty. filed Jan. 28, 2026); *Diamond Towers II LLC v. DISH Wireless L.L.C.*, No. 2026CV30222 (Colo Dist. Ct. filed Jan. 19, 2026); *Sabre Indus., Inc. v. DISH Wireless Leasing L.L.C.*, No. 1:26-cv-00209-JAC (S.D.N.Y. filed Jan. 12, 2026); *Zayo Group, LLC v. DISH Wireless, L.L.C.*, No. 2025CV34300 (Colo Dist. Ct. filed Nov. 26, 2025); *Aircomm of Avon, LLC v. DISH Wireless, L.L.C.*, No. 1:25-cv-03756 (D. Colo. filed Nov. 20, 2025); *Am. Towers LLC v. DISH Wireless, L.L.C.*, No. 1:25-cv-3311 (D. Colo. filed Oct. 20, 2025).

claimed its "obligations are excused" with no acknowledgement that it owed Comcast ███ under the MSA. At the same time, DISH insisted that it "need[ed] to continue to operate certain Services (as defined in the Agreement) for a period of time," thereby holding *Comcast* to its contractual obligations while refuting its own. A true and correct copy of DISH's September 25, 2025 letter is attached hereto as **Exhibit B**.

43.     In conjunction with this letter, DISH also sent Comcast termination notices for 901 service locations. These termination notices would take effect prior to the expiration of the applicable Initial Service Term for all sites.

44.     Contrary to DISH's assertions, the MSA clearly delineates the conditions under which performance is excused. Under the MSA, ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

45.     None of these clearly delineated categories of force majeure applies to DISH's actions here. For starters, the MSA makes clear that ███████████████████ does not constitute a force majeure event. *See id*. Thus, even if the FCC had ordered EchoStar to sell licenses, which it had not done, it would not have qualified as a force majeure event. In any event, EchoStar's decision to sell its licenses was an entirely voluntary business decision, as the FCC had only opened an investigation into its buildout obligations. EchoStar repeatedly assured

17

stakeholders of its compliance, and the FCC confirmed that EchoStar satisfied its deployment deadlines.

46.     The FCC's investigation also was not an ████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████     Again, there was never any

████     by the FCC requiring EchoStar to sell its terrestrial spectrum licenses.

47.     In all events, it was entirely foreseeable that EchoStar might face FCC scrutiny or decide to sell its terrestrial spectrum licenses. It is common for the FCC to investigate whether wireless licensees have met their buildout deadlines. Indeed, on February 22, 2021, just two months before it signed the MSA, DISH recognized in its Form 10-K: "Failure to comply with FCC build-out requirements in a given license area may result in acceleration of other build-out requirements or in the modification, cancellation, or non-renewal of licenses."[18] It is also common for licensees to sell their spectrum authorizations; EchoStar itself has acquired and sold spectrum licenses in a number of transactions over the years. DISH could have added a provision to the MSA that would have enabled it to terminate the agreement and avoid fees in the event of an FCC investigation or a sale of spectrum by EchoStar. But it chose not to do so—and instead agreed to an MSA containing, among other things, ████████████████████████

████████████████████████████████████████

48.     In addition to the foreseeability of a regulatory investigation or sale of spectrum licenses, DISH's claimed frustration of purpose is undermined by the reality that DISH remains

---

[18] DISH Network Corporation, Form 10-K, at 42 (Feb. 22, 2021), https://ir.echostar.com/static-files/5fe59a85-67e6-4eda-8570-1acf4c8f6781.

18

capable of performing under the MSA. Following the transactions with AT&T and SpaceX, EchoStar will continue to hold valuable 700 MHz, paired AWS-3, and CBRS spectrum licenses worth tens of billions of dollars. EchoStar and DISH also have the option of acquiring additional spectrum from other FCC licensees. Additionally, DISH expects to "have a great subscriber base in the marketplace," according to EchoStar's CEO and President Akhavan.[19] DISH thus could continue to deploy a 5G wireless network to its "great subscriber base" if it wished. Furthermore, if the MSA's purpose were frustrated or its value were destroyed, DISH would not insist that Comcast still continue to perform. However, DISH's letter indicated that it "need[ed]" Comcast to continue providing fiber connectivity "for a period of time." EchoStar's strategic business decision to abandon some of its 5G network plans does not excuse DISH's performance under the MSA based on force majeure or a frustration of purpose theory.

### G. Comcast Categorically Rejected DISH's Arguments

49. On October 28, 2025, Comcast responded to DISH by letter, categorically rejecting DISH's attempt to nullify the MSA and making clear that Comcast would fully enforce its rights and DISH's obligations under the MSA. Comcast also acknowledged receipt of DISH's request to terminate services at 901 service locations and explained that "███████████████ ████████ will be invoiced to DISH and will appear on DISH's invoice(s) for the next billing cycle." A true and correct copy of Comcast's October 28, 2025 letter is attached hereto as **Exhibit C.**

---

[19] *EchoStar Corporation (SATS) Discusses On Pioneering What's Next: EchoStar's Vision And Strategy Call (Transcript)*, SEEKING ALPHA (Sept. 15, 2025), https://seekingalpha.com/article/4822911-echostar-corporation-sats-discusses-on-pioneering-whats-next-echostars-vision-and-strategy-call-transcript

50.     Since Comcast's October 28, 2025 letter, DISH sent termination notices for an additional 314 service locations, which would take effect prior to the expiration of the applicable Initial Service Term for all sites.

51.     On December 12, 2025, Comcast wrote a further letter to DISH, reiterating that DISH's performance under the MSA was not excused and that Comcast expected DISH to adhere to its contractual obligations.  Comcast also acknowledged receipt of DISH's request to terminate services at the additional service locations and explained that "[t]he estimated ████████ ███████ for these 1,215 Service Locations ██████████████████ which may be in addition to other damages."[20]  Further, the letter included an express document preservation demand and requested that DISH confirm receipt of the letter and preservation obligations by December 22, 2025.  A true and correct copy of Comcast's December 12, 2025 letter is attached hereto as **Exhibit D**.

52.     On January 14, 2026, nearly three months after Comcast's initial letter and nearly a month after Comcast's requested response deadline, DISH finally responded.  In its response, DISH echoed its previous position, maintaining without any evidentiary basis that "the FCC gave EchoStar no choice but to sell or forfeit spectrum needed to operate the 5G network" and that DISH could not have foreseen that supposed ultimatum.  A true and correct copy of DISH's January 14, 2026 letter is attached hereto as **Exhibit E**.

---

[20] Since the December 12, 2025 letter, DISH sent termination notices for 27 additional service locations, totaling 1,242 service locations and increasing the amount owed at the time of this Complaint to $54,111,313.44, excluding additional damages.

**FIRST CLAIM FOR RELIEF**

**(Declaratory Judgment That DISH Is Not Excused from Its Contractual Obligations under the MSA)**

53.     Comcast incorporates the foregoing allegations by reference.

54.     On April 30, 2021, Comcast and DISH entered into the MSA.

55.     The MSA is a valid and binding contract under New York law.  The parties had capacity, mutually assented to the terms of the contract, and supplied consideration.  The written and signed MSA complies with New York's Statute of Frauds, GOB § 5-701.

56.     At all times, Comcast performed its obligations under the MSA.

57.     Under the terms of the MSA, Comcast provides DISH with cell backhaul in exchange for certain monetary payments.

58.     On September 25, 2025, DISH purported to notify Comcast that "the FCC's actions and the resulting spectrum sales have frustrated the principal purpose and completely destroyed the value of the Agreement and DISH Wireless's ability to perform," and that "[a]s a result, DISH Wireless's obligations are excused."

59.     Here, the plain terms of the MSA do not excuse DISH's performance.  No force majeure event has occurred, nor has there been an ▮▮▮▮▮▮▮▮▮▮▮▮▮ that frustrates DISH's performance or indeed the purpose of the MSA.

60.     Although it was entirely foreseeable that EchoStar might face FCC scrutiny or decide to sell its terrestrial spectrum licenses, DISH did not include a provision excusing its obligations in such cases.  Instead, where DISH seeks to terminate services before the end of the applicable Initial Service Term, the MSA provides for ▮▮▮ which DISH is now declining to pay.

21

61. Additionally, DISH's claimed frustration is undermined by the fact that it could still perform under the MSA and its insistence that Comcast continue its performance, indicating that the MSA still has value and that its purpose has not been frustrated.

62. DISH cannot now avoid its contractual obligations by arguing that the purpose of its performance is frustrated or otherwise excused based on the occurrence of events that were entirely foreseeable at the time of contracting.

63. On October 28, 2025, Comcast responded by categorically rejecting DISH's invocation of force majeure and asserting that Comcast would fully enforce its rights and DISH's obligations under the MSA.

64. On December 12, 2025, Comcast wrote a further letter to DISH, reiterating its position that no force majeure occurred and that it expected DISH to adhere to its obligations under the MSA. The letter also included a preservation demand and requested that DISH confirm receipt of the letter and preservation obligations by December 22, 2025.

65. On January 14, 2026, DISH finally responded to Comcast's letters, reiterating its baseless claims that the FCC forced EchoStar to sell spectrum and that this development was not foreseeable.

66. An actual and substantial controversy exists between the parties regarding their rights and obligations under the MSA, including whether force majeure or frustration of purpose occurred and whether DISH remains obligated to perform its contractual duties. This controversy is immediate, real, ongoing, and justiciable.

67. Pursuant to 28 U.S.C. §§ 2201 and 2202, Comcast is entitled to a declaration confirming that no force majeure or frustration of purpose occurred under the MSA; DISH is not

excused from performing its obligations under the MSA; the MSA remains in full force and effect; and DISH remains obligated to perform all its obligations under the MSA.

68.    Such a declaration would resolve the present controversy.

69.    Comcast seeks a declaratory judgment because DISH's breach of the MSA is continuing in nature, with damages accruing each time DISH cancels additional circuits and refuses to pay the corresponding ███ when they come due.  Accordingly, only a declaratory judgment will provide a full and adequate remedy from DISH at this time.

**SECOND CLAIM FOR RELIEF**

**(Tortious Interference with the MSA against EchoStar)**

70.    Comcast incorporates the foregoing allegations by reference.

71.    On April 30, 2021, Comcast and DISH entered into the MSA.

72.    The MSA is a valid and binding contract under New York law.  The parties had capacity, mutually assented to the terms of the contract, and supplied consideration.  The written and signed MSA complies with New York's Statute of Frauds, GOB § 5-701.

73.    At all times, Comcast performed its obligations under the MSA.

74.    While EchoStar was not a party to the MSA, it was aware of the MSA.

75.    Upon information and belief, EchoStar intentionally and improperly interfered with the MSA by causing DISH to repudiate the MSA through baseless claims of force majeure and frustration of purpose, and to withhold payment of the ███ to Comcast.

76.    In keeping with EchoStar's scheme, DISH has breached the MSA by failing to pay ███ that were invoiced by Comcast pursuant to the MSA and have come due.

77.    As a result of EchoStar's intentional inducement of DISH's breach, Comcast has suffered damages totaling $54,111,313.44 as of the date of this Complaint.  These damages continue to accrue as DISH cancels additional circuits and refuses to pay the corresponding ▮ required under the MSA.

## PRAYER FOR RELIEF

78.    WHEREFORE, Comcast is entitled to a judgment against DISH and EchoStar:

a.    Declaring that: (i) no force majeure or frustration of purpose occurred under the MSA; (ii) DISH is not excused from performing its obligations under the MSA; (iii) the MSA remains in full force and effect; and (iv) DISH remains obligated to perform all its obligations under the MSA;

b.    Awarding Plaintiff all available damages for EchoStar's tortious interference with Plaintiff's contractual relationship with DISH;

c.    Awarding Plaintiff its costs in this action; and

d.    Awarding any other relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Comcast hereby demands a jury trial of all claims so triable.

Dated: February 27, 2026

Respectfully submitted,

By: */s/ Matthew A. Brill*
    Matthew A. Brill
    Matthew T. Murchison
    Jason R. Burt
    Andrew S. Bridgewater
    matthew.brill@lw.com

24

matthew.murchison@lw.com
jason.burt@lw.com
andrew.bridgewater@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: 202-637-2200
Fax: 202-637-2201

Chloé L. Nurik
chloe.nurik@lw.com
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212-906-1200
Fax: 212-751-4864

*Attorneys for Plaintiff Comcast Business
Communications, LLC*

25